**STATE of Missouri, Respondent,**

**v.**

**Latrell S. EVERLY, Appellant.**

**No. 52797.**

Supreme Court of Missouri, Division No. 2.

July 8, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Thomas J. O'Brien, Special Asst. Atty. Gen., Kansas City, for respondent.

Henry F. Luepke, Jr., James A. Singer, St. Louis, for defendant-appellant.

FINCH, Presiding Judge.

Defendant, charged under the Second Offender Act with stealing $40 from the person of one Hoefner without his consent, was convicted by a jury. The trial court made the necessary findings with reference to a prior conviction and sentenced defendant to imprisonment for a term of six years. Defendant appealed after his motion for new trial was overruled. We affirm.

The principal question for determination on this appeal is whether defendant was deprived of constitutional rights and was prejudiced as a result of his identification at the police station where he was placed in a lineup.

■ Defendant's brief complains that he was deprived of his constitutional right to counsel at the lineup, citing United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. The requirement of counsel at the lineup, established by Wade, is applicable only to confrontations for identification purposes after June 12, 1967. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. The date of the lineup here involved was April 18, 1966. Consequently, failure to provide counsel to defendant at that lineup did not violate his constitutional rights.

■ There remains the question of whether the identification procedures at the police station were so suggestive and unfair that they affected the "in court" identification of this defendant at his trial and amounted to a denial of due process. This depends on the totality of the circumstances. Stovall v. Denno, supra. Accordingly, we recite so much of the evidence as is necessary to determine this question.

On the afternoon of April 18, 1966, one Hoefner, a rent collector, went to the Eagle Lounge on North Grand Boulevard, in the City of St. Louis, to collect a payment due from the owner of that establishment. When Hoefner opened the door and start-ed to enter the Lounge, a young man, later identified as Clarence Mitchell, blocked his entrance by kneeling across the doorway. When Hoefner started to step over Mitchell, he was jostled by two young men who came up from behind. One of these men, subsequently identified as the defendant, jostled Hoefner on his left side and reached into his left-hand coat pocket, taking a paper folder containing $40 in cash (one twenty and two ten-dollar bills) and some rent receipts. The man who was on Hoefner's right disappeared immediately and was not thereafter seen.

When Hoefner was jostled, he turned around and looked at defendant. They stood facing each other for a period which Hoefner estimated at perhaps five seconds. Defendant and Mitchell then started south on Grand Avenue. Hoefner discovered that his packet was gone and he pursued the men and caught Mitchell. Defendant was with him and Hoefner got a good look at him again at that time.

Hoefner brought Mitchell back to the Lounge. He denied that he had taken Hoefner's money and explained that he was on the floor looking for a quarter which he said had gone behind the cigarette machine. Hoefner then released Mitchell and he again went south on Grand Avenue.

All of these proceedings were viewed by Beulah Kirkwood and Ruth Pate, two women employed at the Lounge. Both were waitresses and Ruth Pate was acting as manager. Both knew Hoefner and Ruth Pate had a check of her employer to deliver to him on that occasion. Both women saw Hoefner start in. Beulah Kirkwood saw Mitchell kneeling in front of the door and saw two other young men behind Hoefner who started to push him. She testified that she got a good look at defendant's face. She did not know how long the defendant was in her vision but testified it was long enough to get a good look at him. She was positive that defendant on trial was the man she saw at the tav-

ern. She also described the third man who got away and was not seen thereafter.

Ruth Pate also saw Mitchell stooped in front of Hoefner and saw the defendant behind and that they had pinned him in the doorway. She saw that the defendant had a folder in his hand. He and Mitchell then both went south on Grand Avenue.

Ruth Pate went outside and observed an off duty policeman whom she knew. She hailed him and reported to him what had happened. As she was talking to Officer Holt, she observed Mitchell and a man whom she testified was the defendant down the street about a block from the Lounge. She pointed them out to Officer Holt and he and other officers then pursued them. They apprehended the defendant and Mitchell at a point about 350 yards from the Lounge. At that time Mitchell was walking on one side of the street and the defendant on the other. The two men were arrested and taken to the police station, where a twenty-dollar bill was found in one of the defendant's socks and a ten-dollar bill in the other. Some rent receipts and papers of Hoefner were found in a gangway into which defendant was observed to have gone.

That evening, Hoefner, Ruth Pate and Beulah Kirkwood went to the police station at the request of the police officer. They knew that two persons had been arrested that afternoon. The two women arrived and were taken back to the detectives' office. They observed Mitchell in a cell as they walked back but did not see the defendant at that time. A little later Hoefner and his wife arrived at the police station and he also was taken back to the same detectives' office. He also got a passing glance of Mitchell in a cell but did not see the defendant.

The officers then had the three witnesses view a lineup in which the defendant Everly, Clarence Mitchell and a third person were viewed by the witnesses. According to their best recollection, Mitchell was on one end, defendant Everly on the other end, and a third man was in the middle. Mitchell, who later entered a plea of guilty, appears to have been tall. The record does not disclose the height or size of the defendant except that he was a shorter man, and the record indicates that the man in the center also was a shorter man of perhaps medium weight. Both Mitchell and the defendant had on the same clothes at the time of the lineup which they had been wearing when arrested. The defendant was wearing what was described as a light tan raincoat or trench coat and a dark hat.

The three witnesses did not talk among themselves as to whether any of the ones in the lineup were the ones whom they had observed. Instead, they simply indicated to the officers the ones whom they recognized, and those were Clarence Mitchell and the defendant.

After the lineup had been concluded Mitchell and defendant were brought, one at a time, into the detectives' room in the presence of the three witnesses, where they were questioned, but no admissions were made by the defendant, and at the trial no confessions or admissions of the defendant were offered in evidence against him.

The defendant contends that the occurrences at the police station were unfair and prejudicial in that they were suggestive and crystallized the identification of the defendant by the three witnesses. He relies on the fact that both Mitchell and the defendant were placed in the same lineup and that the defendant was wearing the trench coat in which he was arrested, whereas no trench coat was worn by the other persons in the lineup. He also objects to the opportunity of the witnesses to observe defendant when he was questioned.

At the trial counsel for the defendant vigorously cross-examined these witnesses on their identification and repeatedly sought to show that the witnesses identified the defendant on the basis of the light colored trench coat he was wearing rather than on his physical appearance and facial

characteristics. An examination of the transcript, however, indicates that the witnesses were quite positive in their identification of the defendant. They testified that their identification was based upon a recognition of the defendant's face and not on his trench coat. For example, Ruth Pate testified that she observed the defendant when he was standing in the doorway "long enough to know his face and I wouldn't forget it, either." She stated that the defendant had a small mustache, that she observed him very clearly, and that the man whom she observed in the courtroom and in the lineup was the same man whom she had seen in the doorway of the Lounge when Hoefner was robbed.

Beulah Kirkwood testified that she got a good look at the defendant's face and she was positive that the defendant on trial and whom she observed at the lineup was the man she had seen at the tavern. She didn't know how long he was in her vision but it was long enough to get a good look at him. She testified further that she just doesn't forget a face when she has seen one. She stated, on inquiry, that the defendant was wearing a trench coat but that she could have identified him without it.

■ Under these circumstances, it is clear that these three witnesses had a good opportunity to observe the defendant at the time of the crime. All three emphatically based their identification on observation of defendant at the scene of the crime. The defendant was arrested a short time later in the vicinity of the Lounge where the robbery took place. The defendant and Clarence Mitchell were pointed out by Ruth Pate to the officers as the ones committing the robbery at a time when they were within one block of the Lounge, and the officers then pursued them and arrested them. At the police station the defendant had a twenty-dollar bill in one sock and a ten-dollar bill in the other. The money taken consisted of one twenty-dollar and two ten-dollar bills. Under these circumstances, we find nothing in this record

to indicate that the "in court" identification of the defendant by Hoefner, Ruth Pate and Beulah Kirkwood was the result of suggestive influences by the police at the police station. It does not appear to us that what occurred there, on the facts before us, produced a lack of due process as to this defendant, and we therefore overrule this contention. State v. Hill, Mo., 419 S.W.2d 46.

The other points asserted on appeal by the defendant are that he was deprived of constitutional rights when the court failed to act favorably on his motion for a transcript of the preliminary hearing, when the court refused to allow him to examine police reports made by the arresting officers, and when the court refused to allow him to examine statements given by Hoefner, Kirkwood and Pate to the Circuit Attorney's office.

■ In the first place, the transcript does not disclose any motion requesting that the defendant be furnished with a transcript of the preliminary hearing. As a matter of fact, the only reference to that question in the transcript is a statement in the motion for new trial reciting that the court erred in overruling defendant's request to obtain a transcript of the proceedings at his preliminary hearing. Allegations in the motion for new trial do not prove themselves and there is nothing on this point before us to review. As a matter of fact, in the defendant's brief the statement is made that "the Court never took any action on defendant's request for a transcript and it was apparent that it was impossible to obtain such a transcript." This statement would indicate that if such a request was made, it was never ruled on and the defendant did not pursue the question. The statement further implies, at least, that no such transcript existed. As a matter of fact, the only requirement in Missouri that evidence at a preliminary hearing be reduced to writing is in the case of a homicide. Supreme Court Rule 23.12, V.A.M.R. Accordingly, we overrule

the contention with respect to the transcript at the preliminary hearing.

 The record is devoid of anything relative to the contention in defendant's brief that the trial court refused to allow him to examine police reports relating to the arrest and interrogation of the defendant. We find no such request in the transcript before us. As a matter of fact, there is no reference to this matter in the motion for a new trial. The closest thing is simply a general statement that the court erred in overruling defendant's motion for a subpoena duces tecum, and we do not find in the transcript before us any such request for a subpoena duces tecum or any action by the court thereon. Accordingly, there is nothing before us in connection with this contention.

■ Finally, the defendant's brief complains that the court erred when it refused to allow him to examine warrant office statements given by Hoefner, Kirkwood and Pate to the Circuit Attorney's office.

The only reference in the transcript with respect to such a request appears during the cross-examination of witness Hoefner. Defendant's counsel, out of the hearing of the jury, told the court that he had given a subpoena duces tecum to the Circuit Attorney's office to produce these statements and he wanted to examine the statements because he thought that an examination of them would show that Mr. Hoefner had stated that he did not see who took the money from him. The State objected but the trial court overruled the objection and permitted counsel to examine that part of the statement and then proceeded with further cross-examination of Mr. Hoefner. No further request of this character appears in the transcript, and the trial court gave the defendant all that he asked for in this connection. The statement was not introduced in evidence and actually used for purposes of impeachment, but it was exhibited to counsel and he had the opportunity to do so, and that was all that was re-

quired. We find no merit to this contention.

We have examined those matters required by Supreme Court Rule 28.02, V.A. M.R., and find no prejudicial error therein.

Judgment affirmed.

All of the Judges concur.